UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
UNITED STATES OF AMERICA,

                                                                           Docket No. 19-CR-54 (NGG)

 -against-

DARIN HAMILTON,
                                Defendant.
-----------------------------------------------------------

## MOTION FOR BAIL HEARING

                                                                                 Kelley J. Sharkey
                                                                                 Kenneth Montgomery
                                                                                 Attorneys for Darin Hamilton

March 15, 2020

cc: AUSA Tanya Hajjar

Introduction

Defendant Darin Hamilton moves the Court for a bail hearing and an order granting his release. Darin Hamilton, who is a pretrial defendant currently detained at the MDC Brooklyn, is within the group of people the Centers for Disease Control and Prevention ("CDC") has categorized as most-at-risk for contracting COVID-19, a dangerous illness spreading rapidly across the world, through New York State, and within New York City. The Bail Reform Act provides for the "temporary release" of a person in pretrial custody "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). The health risk to Darin Hamilton, because of his age and condition is enormous. Mr. Hamilton is 62 years old suffers from dementia, has had at least one stroke, a heart attack and has Lupus. We have independently confirmed his medical history, but include three pages from his BOP medical record that confirm that medical history. Given the conditions at the MDC, as described in detail below, necessitates his temporary release on bail until this pandemic has ended. We have been able to confirm with the mother of his adult children that he is welcome to reside with her as long as the current environmental conditions associated with the COVID-19 pandemic exist

**Factual Background**

*Changed Circumstances: COVID-19 Outbreak*

As of March 12, 2020, the new strain of coronavirus which causes COVID-19, has infected over 132,300 people, leading to at least 4,954 deaths worldwide.[1] On March 11, 2020, the World Health Organization officially classified COVID-19 as a pandemic.[2] Governor

---

[1] *Coronavirus Map: Tracking the Spread of the Outbreak*, The New York Times (March 12, 2020), *at* https://nyti.ms/2U4kmud (updating regularly).
[2] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (March 11, 2020) *at* https://bit.ly/2W8dwpS.

Cuomo declared a State of Emergency on March 7, 2020.[3]  Mayor DiBlasio declared a State of Emergency in New York City on March 12. 2020, banning gatherings of over 500 people.[4] On March 12, 2020, there are 325 positive cases in New York State[5]; there are 95 positive cases in New York City.[6]  As of March 15, 2020 there are 5 reported deaths due to the virus, schools will be closed as on March 16, 2020 and the Brooklyn, MDC has been shut down for legal visits.

The CDC has issued guidance that individuals at higher risk of contracting COVID-19—adults over 60 years old and people with chronic medical conditions such as lung disease, heart disease, and diabetes—take immediate preventative actions, including avoiding crowded areas and staying home as much as possible.[7]  With confirmed cases in New York City that indicate community spread, we must take every necessary action to protect vulnerable populations and the community at large.

### Conditions of Confinement and Spread of Coronavirus

Conditions of pretrial confinement create the ideal environment for the transmission of contagious disease.[8]  Inmates cycle in and out of BOP pretrial facilities from all over the world and the country, and people who work in the facilities leave and return daily, without screening. Incarcerated people have poorer health than the general population, and even at the best of times,

---

[3] *At Novel Coronavirus Briefing, Governmor Cuomo Declares State of Emergency to Contain Spread of Virus*, New York State (March 11, 2020) *at* https://on.ny.gov/2TKzIoz.

[4] *DeBlasio Declares State of Emergency in NYC, and Large Gatherings Are Banned*, New York Times (March 12, 2020)

[5] *Novel Coronavirus (COVID-19),* New York State Department of Health (March 12, 2020) *at* https://on.ny.gov/2vfFQvy (updating regularly).

[6] *Coronavirus*, New York City Health (March 12, 2020) *at* https://on.nyc.gov/39ME7wU (updating regularly).

[7] *People at Risk for Serious Illness from COVID-19*, CDC (March 12, 2020) *at* https://bit.ly/2vgUt1P.

[8] Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, *at* https://doi.org/10.1086/521910.

medical care is limited in federal pretrial detention centers.[9] Many people who are incarcerated also have chronic conditions, like diabetes or HIV, which makes them vulnerable to severe forms of COVID-19. According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[10] Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[11] In China, officials have confirmed the coronavirus spreading at a rapid pace in Chinese prisons, counting 500 cases.[12] Secretary of State Mike Pompeo has called for Iran to release Americans detained there because of the "deeply troubling" "[r]eports that COVID-19 has spread to Iranian prisons," noting that "[t]heir detention amid increasingly deteriorating conditions defies basic human decency."[13] Courts across Iran have granted 54,000 inmates furlough as part of the measures to contain coronavirus across the country.[14] Brooklyn District Attorney Eric Gonzalez, joined by public health experts, has asked Governor Cuomo to grant emergency clemencies to elderly and sick prisoners.[15]

---

[9] Laura M. Maruschak et al. (2015). Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12. NCJ 248491. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, *at* https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf

[10] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), *at* https://bit.ly/2W9V6oS.

[11] *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020) *at* https://bit.ly/2TNcNZY.

[12] Rhea Mahbubani, *Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials*, Business Insider (Feb. 21, 2020) *at* https://bit.ly/2vSzSRT.

[13] Jennifer Hansler and Kylie Atwood, *Pompeo calls for humanitarian release of wrongfully detained Americans in Iran amid coronavirus outbreak*, CNN (Mar. 10, 2020) *at* https://cnn.it/2W4OpV7.

[14] Claudia Lauer and Colleen Long, *US Prisons, Jails On Alert for Spread of Coronavirus*, The Associated Press (Mar. 7, 2020) *at* https://apnews.com/af98b0a38aaabedbcb059092db356697.

[15] *Coronavirus: Sentenced to COVID-19*, The Daily Appeal (Mar. 12, 2020) at https://theappeal.com

Specific Conditions at the MCC/MDC

MDC Brooklyn and MCC New York have proven—recently and repeatedly—that they are unable to protect the health and safety of defendants in their custody. The MCC and MDC are massive pretrial detention facilities: the MCC houses approximately 700 people and the MDC houses approximately 1,600 people. The majority of the people detained are housed in small two-man cells with a shared toilet and sink, and eat meals and have recreation in groups of 70 or more. Other units are open dormitories that house 70 or more inmates without the ability to separate. The medical care at both facilities has repeatedly failed to adequately address even routine medical conditions such as diabetes, pregnancy, and anemia.[16] In times of crisis, the medical care has halted entirely.

For an entire week in January and February 2019, during the sub-zero temperatures of the "Polar Vortex," MDC Brooklyn went without power and heat, and inmates were locked down for days at a time.[17] Inmates were denied hot food or additional blankets or warm clothing, despite the frigid air inside the facility. Inmates with serious pre-existing physical and mental illnesses received no care.[18] Even the most basic efforts, such as moving inmates requiring sleep apnea machines to breathe to the available floors with electricity, were not taken.[19]

In granting downward sentencing variances in a series of cases after the blackout, Judge Chen noted that inmates at the MDC were "subjected to very cruel conditions," and that "there

---

[16] *E.g., National Association of Women Judges (NAWJ) Women in Prison Committee (WIP) Second Visit to BOP's Metropolitan Detention Center (MDC), Brooklyn, New York, June 3, 2016*, at https://bit.ly/39JRhdW.

[17] *See* Annie Correal, *No Heat for Days at a Jail in Brooklyn Where Hundreds of Inmates Are Sick and "Frantic,"* N.Y. Times (Feb. 1, 2019), *at* https://nyti.ms/2sXCIQg; Complaint, *Scott v. Quay*, 19-CV-1075 (MKB) (E.D.N.Y. Feb. 22, 2019), ECF No. 1.

[18] Complaint, *Scott v. Quay*, 19-CV-1075 (MKB) (E.D.N.Y. Feb. 22, 2019), ECF No. 1.

[19] *Review and Inspection of Metropolitan Detention Center Brooklyn Facilities Issues and Related Impacts on Inmates*, Office of the Inspector General, U.S. Department of Justice at 29 (September 2019) *at* https://oig.justice.gov/reports/2019/e1904.pdf.

was a reluctance of the part of the officials at MDC Brooklyn to correct the conditions or even to disclose them timely."[20]  Judge Furman reached the same conclusion: "It's pretty clear to me . . . that steps could have been taken, and taken more quickly, to address the problems at the MDC. And the bottom line is, the conditions that I read about are the conditions that one associates with a third world country and not a country like this, and nobody in detention . . . should have to endure that as the detainees did at the MDC."[21]

MCC New York demonstrated a similar inability to appropriately care for defendants just last week.  For eight days, every inmate endured a full lockdown, without access to family members or attorneys, while law enforcement searched for a loaded gun brought into the facility by a correctional officer.[22]  Federal Defenders of New York clients reported to attorneys that mice and water bugs ran through the units as guards unblocked holes in walls and vents that inmates had stuffed with clothing to prevent pests.  Inmates on one unit were forced to share one toilet among twenty-six people, and prevented from washing their clothing: prime conditions for the spread, rather than containment, of infectious disease.  On other units, toilets overflowed in two-man cells, spreading raw sewage.  Inmates with serious medical conditions, including AIDS and anemia, were denied medications or medical care.  Female inmates were denied feminine hygiene supplies.  No clean drinking water was provided; inmates were forced to drink from their bathroom sinks, from which brown water often ran.

To date, the MCC and MDC have not met even the most basic recommendations of the

---

[20] Tr. of Sent. Hr'g. at 12, *United States v. Acosta De La Rosa*, 18-CR-667 (PKC) (E.D.N.Y. Jun. 4, 2019) (ECF No. 16).  *See United States v. Bruney*, 18-CR-542 (PKC) (E.D.N.Y. 2019); *United States v. Douglas*, 18-CR-554 (PKC) (E.D.N.Y. 2019).
[21] Tr. of Sent. Hr'g at 31, *United States v. Ozols*, No. 16-CR-692 (JMF) (S.D.N.Y. Feb. 12, 2019) (ECF No. 31).
[22] *See* Stephen Rex Brown, *Strip Searches, Frozen Bologna Sandwiches and Wrecked Cells: MCC Inmates Detail Lockdown Due to Smuggled Gun*, N.Y. Daily News, Mar. 6, 2020, *at* https://bit.ly/2xqbgjw.

CDC for preventing the spread of the coronavirus. Because of this, counsel has begun to encounter difficulties finding interpreters and experts willing to enter these facilities, and the many lawyers who are at high risk because of age or underlying medical condition have also been advised not to enter. Both facilities are still waiting for guidance from the BOP on screening and treatment. In the meantime, neither facility has a screening mechanism in place for staff or visitors, other than self-reporting. The MCC lacks even a basic sign advising people who have traveled to the highest-risk countries not to enter. Staff are not wearing face masks or gloves. Neither facility has hand sanitizer available.[23] The MCC has no soap, hot water, or paper towels in the visitors' bathroom. Both facilities plan to provide bar soap to inmates, but as of now, not every inmate has access to soap. Only those inmates who have money for commissary will be able to purchase antibacterial soap. Neither facility has any testing for COVID-19 available, and does not know when, if ever, it will have tests. There is no medical ward or facility in place at either institution. At MDC, the only stated plan, should an inmate become symptomatic for COVID-19, is to confine that inmate to the SHU, where the cells are cold, rife with black mold, and the ceiling leaks directly onto the beds.

As additional people are arrested who have been out in the community as the coronavirus spreads, if they are not symptomatic, they will be brought into the MCC and MDC, and held with the existing population, potentially bringing COVID-19 into this population held in large numbers, close quarters, and low sanitary conditions. On March 12, 2020, Magistrate Judge Orenstein decided that detaining a pre-trial defendant who was using drugs while on supervision would present too great a risk to the staff and inmates at MDC Brooklyn, ruling that part of the "danger to the community" calculus had to include the risk of a new inmate bringing the virus

---

[23] On March 12, 2020, the Warden of the MCC advised that they are seeking to order hand sanitizer, and that the BOP has relaxed its strictures on hand sanitizer during this period. The Warden had no information as to when hand sanitizer might arrive at the facility.

into the facility.  *United States v. Raihan*, 20 Cr. 68 (BMC) (Mar. 12, 2020).

The MDC and MCC have only the most minimal provisions for remote access should a quarantine be necessary: The MCC has one video-conference setup available for all 700 inmates that has not yet been tested to see if it connects with the courthouse or Probation.  The MDC has two video-conference setups, one in SHU, and one in general population, for all 1600 inmates.

### The Bail Reform Act Requires Darin Hamilton's Release

A "judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i).  The circumstances that existed when Darin Hamilton was ordered detained have now changed.  There is a pandemic that poses a direct risk to Darin Hamilton that is far greater if he continues to be detained during this public health crisis.

Darin Hamilton is vulnerable because he is 62 years old suffers from dementia, has had at least one stroke, a heart attack and has Lupus. As an initial matter, the Bail Reform Act requires that a court should "bear in mind that it is only a 'limited group of offenders' who should be denied bail pending trial." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (quoting S. Rep. No. 98-225 at 7, as reprinted in 1984 U.S.C.CA.N. 3182, 3189); *see United States v. Salerno*, 481 U.S. 739, 755 (1987) (suggesting that "detention prior to trial or without trial is the carefully limited exception" to liberty before trial).  One charged with a crime is, after all, presumed innocent.  *Stack v. Boyle*, 342 U.S. 1, 4 (1951).  A single individual unnecessarily detained before trial is one individual too many, and the increasing use of the practice places tremendous wear on our constitutional system.  *United States v. Montalvo-Murillo*, 495 U.S.

711, 723–24 (1990) (Stevens, J., dissenting, joined by Brennan and Marshall, JJ.). Due to the crucial interests involved, it follows that a "case-by-case" approach is required at any stage of the case in assessing the propriety of pretrial detention. *See United States v. Gonzales Claudio*, 806 F.2d 334, 340 (2d Cir. 1986) (discussing due process analysis for evaluating propriety of prolonged pretrial detention, and the interests at stake) (citations omitted), *cert. dismissed sub nom.*, *Melendez-Carrion v. United States*, 479 U.S. 978 (1986).

The courts have long recognized that there is no greater necessity than keeping a defendant alive, no matter the charge. As Judge Weinstein held, "We do not punish those who have not been proven guilty. When we do punish, we do not act cruelly. Continued incarceration of this terminally ill defendant threatens both of these fundamental characteristics of our democracy." *United States v. Scarpa*, 815 F.Supp.88 (E.D.N.Y. 1993) (pretrial defendant with AIDS facing murder charges released on bail because of the "unacceptably high risk of infection and death on a daily basis inside the MCC"). *See also United States v. Adams*, No. 6:19-mj-00087-MK, 2019 WL 3037042 (D. Or. July 10, 2019) (defendant charged with violation of the Mann Act and possession of child pornography and suffering from diabetes, heart conditions and open sores released on home detention because of his medical conditions); *United States v. Johnston*, No. 17-00046 (RMM) 2017 WL 4277140 (D.D.C. Sept. 27, 2017) (defendant charged with violation of the Mann Act and in need of colon surgery released to custody of his wife for 21 days); *United States v. Cordero Caraballo*, 185 F. Supp. 2d 143 (D.P.R. 2002) (badly wounded defendant released to custody of his relatives).

This Court should consider the "total harm and benefits to prisoner and society" that continued pretrial imprisonment of Darin Hamilton will yield, relative to the heightened health risks posed to Darin Hamilton during this rapidly encroaching pandemic. *See United States v.*

*D.W.*, 198 F. Supp. 3d 18, 23 (E.D.N.Y. 2016); *Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring) (calling for heightened judicial scrutiny of the projected impact of jail and prison conditions on a defendant); *United States v. Mateo*, 299 F. Supp. 2d 201, 212 (S.D.N.Y. 2004) (reducing sentence where defendant's pretrial conditions were "qualitatively more severe in kind and degree than the prospect of such experiences reasonably foreseeable in the ordinary case"); *United States v. Francis*, 129 F. Supp. 2d 612, 619-20 (S.D.N.Y. 2001) (reducing sentence in acknowledgment of "the qualitatively different, substandard conditions to which the Defendant was subjected" in pretrial detention).

### Conditions of Release Are Available That Allow Darin Hamilton To Be Treated Humanely While Also Ameliorating Any Danger To The Community

From Darin Hamilton's perspective his life—not only his liberty—is on the line, creating a powerful incentive to abide by any release conditions the Court may impose and changing the calculus that initially led to the denial of bail in this case. Darin Hamilton was arrested at a mens shelter. He was able to provide very little information to counsel at that time. It was only after a mitigation expert and an investigator were assigned that we were able to locate family and obtain medical records.

Critically, during this temporary release, Darin Hamilton will not be left to his own devices, but will be supported and monitored by Pretrial Services. Since 2009, Pretrial Services' data has found that only 2.9% of defendants in the highest risk category were re-arrested for a violent crime while on release.[24] In the Eastern District of New York, Chief U.S. Pretrial Services Officer Roberto Cordeiro reports that in Fiscal Year 2019, only six of 1,300 defendants (0.5%) under Pretrial Services' supervision failed to appear in court; only 2.8% were rearrested.

---

[24] Thomas H. Cohen, Christopher T. Lowenkamp, and William E. Hicks, *Revalidating the Federal Pretrial Risk Assessment Instrument (PTRA): A Research Summary* (September 2018) *at* https://www.uscourts.gov/sites/default/files/82_2_3_0.pdf.

The elderly and chronically ill, no matter what crime they are accused of, pose a lower risk of violating supervision, particularly during a global pandemic during which even leaving the house will endanger their lives.

We have confirmed that if released, Mr. Hamilton would be allowed to reside with Bonnie Simmons, the mother of his children. Ms. Simmons resides at 1650 Pacific Street, Brooklyn, N.Y. Her phone number is available upon request. We prospectively consent to conditions imposed by Pretrial Services such as monitoring, curfews, etc.

## Conclusion

Darin Hamilton is afraid for his life if required to remain at the MDC during another lock down. He has advised both counsel and the assigned mitigation specialist about his legitimate fears. Our client is among the vulnerable population at heightened risk of getting very sick from this illness.  For all of the above reasons, Darin Hamilton should be granted release on bond.

Respectfully submitted,

/s/
Kelley Sharkey and Kenneth Montgomery

917-796-3352     917-770-5590

cc: AUSA Tanya Hajjar