

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

NS:TH
F. #2017R00390

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

March 16, 2020

By Email and ECF

The Honorable Margo K. Brodie
United States District Judge
United States District Court
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Darin Hamilton, et al.
                 Criminal Docket No. 19-54 (NGG)

Dear Judge Brodie:

      The government respectfully submits this letter in response to defendant Darin Hamilton's motion for release on bail, filed on March 15, 2020, in which he requests to be temporarily released from Bureau of Prisons custody during the pendency of the COVID-19 pandemic.  For the reasons set forth below, the motion should be denied.

    I.    <u>The Defendant Is a Danger to the Community and a Risk of Flight</u>

      As set forth in the government's original detention memorandum, which is incorporated herein by reference, the defendant Darin Hamilton is a danger to the community and poses a risk of flight.  The defendant is charged by indictment with two counts of murder while engaged in narcotics trafficking, as well as conspiracy to do so the same.  The charged crimes arise out of the defendant's participation in a large-scale heroin and cocaine trafficking organization, which operated in Queens, New York in the early 1990s.  The defendant was a member of a drug crew known as "Black Rain," which sold heroin under the label "Black Rain," cocaine under the label "White Lightning," and crack cocaine under the label "Thunder."

      The defendant is charged with two murders while engaged in narcotics trafficking, both of which took place near the intersection of 128th Street and Rockaway Boulevard in Queens, where the defendant managed a Black Rain drug spot.

      On June 24, 1992, the defendant shot and killed Anthony Lloyd, also known as "Juice," on the sidewalk in front of the drug spot.  The defendant committed the murder

because he believed Lloyd had been stealing from Black Rain.  He then ordered the woman he was living with to dispose of the murder weapon by throwing it off of the Triborough Bridge.  The defendant later warned the woman not to report him to law enforcement, and threatened her safety.  At the direction of law enforcement, the woman later visited the defendant at Rikers Island, equipped with a recording device, and recorded a conversation with the defendant.  During the recorded conversation, the defendant made the following statements, among others:

> HAMILTON: Whenever it becomes time for you to testify.  What is the point of testifying against me?  Whoever is going to testify against me number one, they'd be a lying motherfucker, they'll get on the stand one day, and they ain't gonna get on it, the next.
>
> \*   \*   \*
>
> HAMILTON: I didn't send nobody to tell you to shut the fuck up.  If you're trying to put me away—then I'm going to have someone take your ass out, I'm not trying to be in this motherfucking dump.  Whoever they got, is lying because nobody saw me do jack shit.  I know this is the first shit happened in June.
>
> \*   \*   \*
>
> HAMILTON: I know if they did, they'll never make it to trial, which I'm counting on.  'Cause, I don't, I don't know how in the fuck they got, they got somebody saying, they saw me do the shooting.  'Cause I know they don't.
>
> [Witness]: They said, somebody snitching.
>
> HAMILTON: Yeah, they got an informant, an informant.  They had a search warrant.  My name is not on that lease.  That's not my house.  I don't know who the fuck—I got plenty of friends up there.  Who got my shit.  You just found me in the house.

The defendant subsequently pleaded guilty to one count of manslaughter in the second degree and one count of intimidating a victim or witness in connection with this crime.

In August 1992, the defendant and his co-defendant Jerome Jones recruited and paid two other members of Black Rain to murder Robert Arroyo, a man they believed was a police informant.  These Black Rain members attempted to shoot Arroyo, but mistakenly shot a different man instead.  On September 8, 1992, at Hamilton and Jones's

direction, the Black Rain members returned to kill their intended target and shot Arroyo multiple times on a crowded street in Queens, causing his death.

Because the defendant has been indicted for narcotics-trafficking offenses for which the maximum sentence is life imprisonment or death, there is a presumption that there are no conditions of release that can reasonably assure his appearance and the safety of the community. See 18 U.S.C. § 3142(e)(3). The defendant cannot rebut such a presumption—nor does he meaningfully attempt to—because the relevant considerations under the Bail Reform Act clearly support a finding of dangerousness and risk of flight. The defendant also has a significant criminal history, including a conviction related to witness tampering. In addition, the crimes charged against the defendant carry a mandatory minimum of twenty years' imprisonment and a maximum penalty of life imprisonment or death, 21 U.S.C. § 848(e)(1)(A), giving him a substantial incentive to flee. United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (possibility of a "severe sentence" heightens the risk of flight).

The risk of obstruction posed by the defendant's release separately warrants detention. See 18 U.S.C. § 3142(f)(2)(B) (a court may order detention if there is "a serious risk that the [defendant] will . . . attempt to obstruct justice, or . . . threaten, injure, or intimidate, a prospective witness or juror.") A finding of a risk of obstruction of justice must be supported by a preponderance of the evidence. United States v. Madoff, 586 F. Supp. 2d 240, 247 (S.D.N.Y. 2009) (preponderance of evidence standard applies to determination of both risk of flight and risk of obstruction of justice).

II.   Release Is Not Warranted Under the "Compelling Reason" Clause

The defendant seeks pretrial release on the grounds that he is within an at-risk category for contracting COVID-19, a respiratory illness that can spread from person to person. The defendant seeks release under 18 U.S.C. § 3142(i), which provides that a "judicial officer may, by subsequent order, permit the temporary release of [a] person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." Certain extreme medical circumstances may present "compelling reasons" that could warrant a highly circumscribed release. For example, the Honorable Jack B. Weinstein agreed to the release of Colombo family captain Gregory Scarpa when that defendant was terminally ill with AIDS, was not expected to live until trial, and his medical condition could not be managed appropriately by prison medical facilities. United States v. Scarpa, 815 F. Supp. 88 (E.D.N.Y. 1993). Even in those extreme circumstances, release was conditioned on the defendant being confined to a hospital under 24-hour guard of the United States Marshal Service, to be reimbursed by the defendant's family. Id. at 92.

According to information received from counsel for the Metropolitan Detention Center ("MDC"), the defendant, a 60-year-old man, is currently housed in a two-

3

man cell with access to hot water and soap at all times.[1]  At present, there have been no confirmed cases of COVID-19 in Bureau of Prisons ("BOP") facilities, including the MDC.[2]  The BOP has implemented national measure to mitigate the spread of COVID-19 within prisons.  See Federal Bureau of Prisons COVID-19 Action Plan, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp.

These measures, which have been implemented at the MDC, include the following:

- Suspension of all social and legal visits:  Social visits and legal visits have been suspended for 30 days, with case-by-case accommodations for attorney visits and legal calls.  Inmates will be provided additional inmate telephone minutes each month.

- Inmate movement:  All inmate facility transfers have been suspended for 30 days, with exceptions permitted for forensic studies or medical or mental health treatment.

- Screening and testing of inmates:  All newly-arriving BOP inmates are screened for COVID-19 exposure risk factors and symptoms.  Inmates with exposure risk factors are quarantined.  In addition, inmates exhibiting flu-like symptoms are isolated (either to single rooms or with other patients) and tested for COVID-19 in accordance with local health authority protocols.

- Modified Operations:  The BOP is implementing modified operations nationally to maximize social distancing and limit group gatherings in BOP facilities, among other modifications specific to each facility.

In addition, counsel at the MDC, after consultation with the relevant staff, has advised the government that inmates incarcerated at MDC, including the defendant, are permitted to take additional steps to self-seclude by remaining in their cells.

---

[1] The medical information provided by the defendant in connection with his motion reflects a history of hypertension and stroke, as well as discoid lupus erythematosus, a chronic dermatological disease (not to be confused with systemic lupus, a more serious autoimmune disease).

[2] One federal detention center in Washington reported that six inmates had what appeared to be flu-like symptoms.  These inmates were isolated and tested.  All six tested negative for COVID-19.  In addition, a staff member in Kentucky was exposed to an individual who had testified positive for COVID-19, and was placed in quarantine for 14 days.  See BOP COVID-19 Status, available at https://www.bop.gov/coronavirus/overview.jsp#bop_covid-19_status

The BOP is monitoring the status of the COVID-19 virus and is taking emergency steps to ensure the safety of its staff, inmates and the public. The defendant is not uniquely situated with respect to the risk of infection of COVID-19, and his personal circumstances do not overcome the significant danger he would pose if released.

Accordingly, the defendant has not presented a "compelling reason" for his release under Section 3142(i). Based on this information, and because the defendant poses an extremely serious danger to the community and risk of flight, the permanent order of detention should remain in effect.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:   /s/ Tanya Hajjar
Tanya Hajjar
Assistant U.S. Attorney
(718) 254-6109

cc:   The Honorable Margo K. Brodie, United States District Judge (by ECF)
      Defense Counsel (by ECF)
      Clerk of Court (by ECF)